```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                 :
ABCNY, INC.,                                                     :
                                                                 :
                              Plaintiff,                         :
                                                                 :    23-CV-9094 (JMF)
                -v-                                              :
                                                                 :    OPINION AND ORDER
                                                                 :
AXIS SURPLUS INSURANCE COMPANY et al.,                           :
                                                                 :
                              Defendant.                         :
                                                                 :
-----------------------------------------------------------------X
```

JESSE M. FURMAN, United States District Judge:

Plaintiff ABCNY, Inc. ("ABCNY"), which owns and has an insurable interest in a New York hotel, brings breach of contract claims against three insurance companies — Defendants Axis Surplus Insurance Company, Landmark American Insurance Company, and StarStone Specialty Insurance Company — for failure to cover costs arising from a fire at the hotel. *See* ECF No. 17 ("FAC"). The parties' dispute, teed up by Defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, turns on whether the hotel, by entering into an agreement with New York City to provide "temporary housing . . . to homeless individuals and families who [we]re seeking asylum," was operating a "shelter." ECF No. 20 ("Defs.' Mem."), at 1. The Court concludes that it was and thus grants Defendants' motion to dismiss.

## BACKGROUND

The following facts, drawn from ABCNY's Amended Complaint and from a document incorporated by reference into the Amended Complaint — namely, an agreement that ABCNY entered into with the New York City Department of Homeless Services ("DHS") and the HANYC Foundation, Inc. ("HANYC"), *see* FAC ¶¶ 18-23; *see also* ECF No. 19-1 ("DHS

Agmt.") — are assumed to be true for purposes of this motion.  *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).[1]

ABCNY owns and has an insurable interest in Hotel Artel 535 (the "Hotel"), a hotel located in New York.  FAC ¶ 9.  Defendants issued three separate, but materially identical, insurance policies to ABCNY.  *Id.* ¶¶ 11, 13, 15.  As relevant here, the policies provided coverage for "all risks of loss up to the limits contained therein, including, *inter alia*, damage resulting [from] fire."  *Id.* ¶ 11; *see also id.* ¶¶ 13, 15.  Significantly, however, the policies included the following "Shelter Deductible":

| TYPE OF DEDUCTIBLE | DEDUCTIBLE |
|---|---|
| AOP Deductible for Artel Location & BYLYN House | $250,000 |
| The $250,000 AOP Deductible applies to any locations that is or becomes a shelter during the term. | |

*Id.* ¶ 35.  In other words, coverage under each policy was subject to an increased $250,000 deductible if the "location[] . . . is or becomes a shelter during the term" of the policy.  *Id.*  The policies do not define either the term "shelter" or the term "hotel."  *Id.* ¶¶ 37-38.

On or about January 3, 2023, ABCNY entered into the DHS Agreement, through which it "agreed to rent hotel rooms at a set rate to provide lodging and personal services for guests who were seeking asylum in New York City."  *Id.* ¶¶ 18-19.  More specifically, the DHS Agreement provided that the Hotel Artel would be "utilize[d] . . . as a site for the Sanctuary Hotel Program,"

---

[1] In their memorandum of law, Defendants cite several documents that are not incorporated by reference into the Amended Complaint: press releases issued by the New York City Mayor's Office, a report issued by the New York City Comptroller, and an Emergency Declaration issued by the New York City Department of Social Services.  *See* Defs.' Mem. 2-3 & nn.1-3.  Although Defendants suggest that the Court can take judicial notice of (at least some of) them, *see id.*; ECF No. 23 ("Defs.' Reply"), at 6-7, the Court need not and does not decide whether that is the case because taking judicial notice of them would not affect the outcome of the case.  *See, e.g.*, *Cortina v. Anavex Life Scis. Corp.*, No. 15-CV-10162 (JMF), 2016 WL 7480415, at *8 n.4 (S.D.N.Y. Dec. 29, 2016).

a program administered by HANYC "through which temporary housing will be provided to homeless individuals and families who are seeking asylum [] in New York City." DHS Agmt. 1. Under the terms of the Agreement, the Hotel Artel was required to reserve 147 rooms in exchange for payment from DHS. *Id*. § 2A. The Hotel agreed to keep the rooms "available to HANYC for DHS clients" for "the express purpose of the Sanctuary Hotel Program" unless it was unable to do so "due to conditions beyond the Hotel's control," *id*. 1, § 3A, and agreed further that the "rooms cannot remain vacant for extended periods of time," *id* § 3D. Under the terms of the Agreement, ABCNY also agreed to provide services, such as "housekeeping . . . linen and toiletries, [and] refuse and trash pickup." *Id*. § 4 (capitalization altered).

Significantly, the Agreement specified that the asylum seekers "in receipt of temporary housing assistance" at the Hotel were "regulated pursuant to New York State Social Services Law and the shelter regulations in 18 NYCRR Parts 491 and 900." *Id*. Attachment A. It further provided that the asylum seekers were "not entitled to choose their own shelter." *Id*. Any asylum seeker who wanted to transfer accommodations had to do so through a "State Administrative Fair Hearing, not [a] Housing Court." *Id*. At the same time, the Agreement acknowledged that the Hotel was "not licensed . . . for use as a homeless shelter o[r] anything else other than use as a hotel," and expressly provided that "[t]he City shall . . . obtain any and all permits, licenses, and other approvals necessary for any activities or services it will conduct or provide" at the Hotel. *Id*. Ex. A, Art. II § 1. In connection with such efforts, the Hotel was required to "reasonably cooperate with the City, upon request." *Id*.

On or about January 7, 2023, a fire occurred at the Hotel, resulting in both physical and economic damages and losses. FAC ¶ 29. ABCNY notified Defendants and made claims under all three policies. *Id*. ¶¶ 30, 32. But Defendants have declined to pay on the ground that the

Hotel was operating as a "shelter" at the time and, thus, the $250,000 "Shelter Deductible" applies. *Id*. ¶ 35. ABCNY does not allege that its damages and losses exceed $250,000.

## LEGAL STANDARDS

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018). A court will not dismiss any claims unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) — that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). More specifically, a plaintiff must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Id*. A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Further, if the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* at 570.

## DISCUSSION

To establish a claim for breach of contract under New York law, which applies here, "a plaintiff must show (1) the existence of an agreement, (2) adequate performance of the contract by the claimant, (3) breach of contract by the accused, and (4) damages." *Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 318 (S.D.N.Y. 2010) (cleaned up). A written contract "must be interpreted according to the parties' intent," which is "derived from the plain meaning of the language employed in the agreement[]." *In re Lehman Bros. Inc.*, 478 B.R. 570, 585-86 (S.D.N.Y. 2012) (internal quotation marks omitted). In a dispute over the meaning of a contract,

4

the "threshold question . . . is whether the contract terms are ambiguous," *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000), which is a question of law for the Court to decide, *see, e.g.*, *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir. 2005); *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004). "An ambiguity exists where the terms of an insurance contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Morgan Stanley Grp., Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997)). By contrast, a contract is unambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)). If a contract is unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion. *See, e.g.*, *Advanced Mktg. Grp., Inc. v. Bus. Payment Sys., LLC*, 300 F. App'x 48, 49 (2d Cir. 2008).

Applying these standards here, the Court concludes that ABCNY's contract claims fail as a matter of law. First, the Court concludes that the relevant term of the policies at issue — "shelter" — is unambiguous. *Webster's Third New International Dictionary* defines the term, in relevant part, to mean "an establishment to shelter the homeless" or "something that covers or affords protection." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2093 (2002). The *Oxford English Dictionary* defines the term as "[s]omething which affords a refuge from danger, attack, pursuit, or observation" or, "in a wider sense, anything serving as a screen or a place of

5

refuge from the weather." OXFORD ENGLISH DICTIONARY 236 (2d ed. 1996). And *Black's Law Dictionary* defines it to mean "[a] place of refuge providing safety from danger, attack, or observation" (and provides related definitions of "homeless shelter," "women's shelter," and "youth shelter"). BLACK'S LAW DICTIONARY 1587 (10th ed. 2014). Differences around the edges aside, these definitions share a common core: "shelter" means the provision of temporary housing to people in need of refuge. It is the latter part of that core that distinguishes a "shelter" from a "hotel," which is defined in ordinary parlance as "a house licensed to provide lodging and usually meals, entertainment, and various personal services *for the public*." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, *supra*, at 1094-95 (emphasis added). While a "hotel" is an establishment that provides lodging to the general public, a "shelter" provides lodging to those in need, such as the homeless.

Second, the Hotel comfortably qualified as a "shelter" during the term of the policies. ABCNY itself all but acknowledges as much in pleading that the Hotel "agreed to rent hotel rooms at a set rate to provide lodging and personal services for guests who were seeking asylum in New York City." FAC ¶ 19.[2] But any doubt is resolved by the DHS Agreement, which specified that the Hotel would be "*utilized as temporary housing*" for "*homeless individuals and families who are seeking asylum*." DHS Agmt. 1 (emphasis added). It further clarified that the asylum seekers "in receipt of temporary housing assistance" were "regulated pursuant to New York State Social Services Law and the *shelter regulations* in 18 NYCRR Parts 491 and 900."

---

[2] "Asylum" is not a term found in the policies themselves. But it is worth noting that "asylum" is defined as "a place of retreat and security: *shelter*" or "the act or the custom of affording *shelter* or protection to one under or in danger of persecution." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, *supra*, at 136 (emphases added). That supports the conclusion that in signing an agreement to provide, and then providing, temporary lodging to those seeking "asylum," ABCNY rendered the Hotel a "shelter" within the meaning of the policies.

6

*Id*. Attachment A (emphasis added). And while the Agreement acknowledged that the Hotel was "an establishment with hotel rooms," it provided that the rooms were to be made "available . . . to be utilized as temporary housing." *Id.* at 1. In other words, ABCNY agreed to provide, and did provide, "refuge," "temporary lodging," and "protection" to otherwise-homeless asylum seekers as part of New York City's emergency Sanctuary Hotel Program. In doing so, the Hotel became a "shelter" within the meaning of the "Shelter Deductible." FAC ¶ 35.

ABCNY's efforts to avoid this straightforward conclusion fall short. First, it suggests that the term "shelter" is ambiguous because it is not defined in the policies. *See* Pl.'s Opp'n 11-13. But "the lack of a definition does not, in and of itself, mean that [a] word must be ambiguous." *Slattery Skanska Inc. v. Am. Home Assur. Co.*, 885 N.Y.S.2d 264, 274 (1st Dep't 2009). Indeed, it is in precisely such circumstances that courts resort to sources such as dictionaries to determine the plain and ordinary meaning of a contract term. *See, e.g.*, *Dish Network Corp. v. Ace Am. Ins. Co.*, 21 F.4th 207, 211 (2d Cir. 2021). As a fallback, ABCNY contends that variations across the dictionary definitions of "shelter" render the term ambiguous. *See* Pl.'s Opp'n 7-9. But the variations are not as great as ABCNY suggests, and courts frequently engage in a "survey" of slightly varying definitions in a search for commonality or to find the definitions most applicable to the relevant context. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 569 (2012); *see also, e.g.*, *MassMutual Asset Fin. LLC v. ACBL River Operations, LLC*, 220 F. Supp. 3d 450, 455 (S.D.N.Y. 2016) ("To determine the plain and ordinary meaning of these terms, dictionary definitions prove useful."). The mere fact "[t]hat there are many definitions of [a] word . . . does not mean its use will always result in ambiguity." *Read Prop. Grp. LLC v. Hamilton Ins. Co.*, No. 16-CV-4573 (CLP), 2018 WL 1582291, at *8 (E.D.N.Y. Mar. 30, 2018).

Taking a different tack, ABCNY posits fanciful hypotheticals to attack the plain and ordinary meaning of "shelter":

> By way of example, if a formerly homeless woman became financially successful and rented a block of hotel rooms for her homeless friends to stay, and the homeless people were staying free of charge to them, would the Hotel be considered a "shelter" . . . ? And what if those friends were not homeless, but were business acquaintances who were not itinerant or homeless but still were staying free of charge to them, would the Hotel still be considered a shelter because the host is paying the bill? And what if it was not the formerly-homeless woman paying the bill, but a non-profit charity she created to enable her homeless friends to enjoy a nice hotel room, would the Hotel then be considered a shelter?

Pl.'s Opp'n 6; *see also id.* at 8 ("Would a hotel [being] booked by a group of cowboys convert the property to a bunkhouse? If the hotel is booked by a school for students visiting, would it become a dormitory?"). The Court gives ABCNY points for creativity. The mere "fact . . . that terms of a policy of insurance may be construed as ambiguous where applied to one set of facts," however, "does not make them ambiguous as to other facts which come directly within the purview of such terms. . . . Even a vague clause may be ambiguous only at its edges." *Morgan Stanley Grp.*, 225 F.3d at 276-77 (cleaned up). Thus, even if the term "shelter" is "vague within certain parameters, . . . it does not render [the policies] ambiguous for purposes of *this* suit." *Id.* at 276 (emphasis added).[3] Here, unlike in the hypotheticals posed by ABCNY, those staying in the hotel did not simply book rooms like any other hotel guest. Instead, they were assigned to

---

[3] For similar reasons, ABCNY's argument that the "Shelter Deductible" is ambiguous because the policy is silent on whether the *entire* Hotel must be operating as a shelter or merely part of it, *see* Pl.'s Opp'n 10, is without merit. The Amended Complaint does not allege that the Hotel contained more rooms than the 147 rooms set aside for asylum seekers under the DHS Agreement. Nor does it allege that ABCNY rented any other rooms at the Hotel to non-asylum-seekers during the term of the DHS Agreement.

8

stay there by the government based on a formal agreement with ABCNY to provide them, at government expense, with temporary refuge. That rendered the Hotel a "shelter."[4]

ABCNY's other efforts to avoid the conclusion that it was operating as a shelter during the term of the DHS Agreement are no more successful. ABCNY stresses all of the ways in which it provided hotel-like services to the asylum-seekers under the DHS Agreement, including housekeeping services, linens, and toiletries, and likens its arrangement with DHS to the reservation of a block of hotel rooms. *See* Pl.'s Opp'n 9-10. But the DHS Agreement made the arrangement unlike any typical hotel reservation, or even block reservation. Among other things, it imposed strict restrictions on the usage and vacancies of the 147 rooms that DHS and the Hotel agreed to make available for the program, *see* DHS Agmt. §§ 3A, 3D; it provided that the asylum-seeker guests were subject to social services laws and shelter regulations, *see id.* Attachment A; and it provided that the program was to "continue on a month-to-month basis until otherwise terminated," *id.* § 1A. ABCNY fails to allege any facts supporting its suggestion that such arrangements are "standard" hotel practices, *see* Pl.'s Opp'n 5, and, even if they were standard, that the "Shelter Deductible" would not kick in in all such circumstances. Meanwhile, the fact that the Hotel provided housekeeping services, linens, and toiletries to the asylum seekers is of no moment. For one thing, there is nothing about the plain and ordinary meaning of "shelter" that precludes such services. For another, the services were required by the DHS Agreement and the particulars did not necessarily conform to the services provided in a standard

---

[4] Because the relevant language in the policies is unambiguous, the doctrine of *contra proferentem*, upon which ABCNY relies, *see* ECF No. 22 ("Pl.'s Opp'n"), at 5, does not apply. *See, e.g., Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 n.2 (2d Cir. 1983) (noting that *contra proferentem* "is used only as a matter of last resort, after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument").

hotel.  *See* DHS Agmt. §§ 4-5 (requiring, for example, "housekeeping services at least every other day").

Finally, ABCNY emphasizes the DHS Agreement's explicit acknowledgment that the Hotel was not licensed to be a shelter.  *See* Pl.'s Opp'n 6-7 (citing DHS Agmt. Ex. A, Art. II § 1).  But this emphasis is a red herring.  The applicability of the "Shelter Deductible" turned on whether the Hotel was or became "a shelter" — not a *licensed* shelter.  *See* FAC ¶ 35.  And, in any event, the DHS Agreement's acknowledgment is nothing more than a statement of fact: that the Hotel was not licensed as a shelter.  If anything, the natural take away from the provision as a whole is that DHS and ABCNY were agreeing that the Hotel could and would act as a shelter as part of the City's emergency efforts to house an influx of asylum seekers *even though* it was not formally licensed to do so.  Among other things, the provision went on emphasize that, if "necessary," the City would "obtain any and all permits, licenses and other approvals" in order to make the Sanctuary Hotel Program work and required the Hotel to "reasonably cooperate" if and when such licenses become necessary.  DHS Agmt. Ex. A, Art. II § 1.  That reading is reinforced by the fact, noted above, that elsewhere the DHS Agreement provided that asylum seekers housed at the Hotel would be "regulated pursuant to New York State Social Services Law and the *shelter regulations* in 18 NYCRR Parts 491 and 900."  *Id.* Attachment A (emphasis added).

In the final analysis, ABCNY agreed to language that would limit its ability to recover if it was operating a "shelter."  There may be edge cases where distinguishing between a "hotel" and a "shelter" would be difficult, but this is not one of them.  In agreeing to provide, and then providing, "temporary housing" for "homeless individuals and families who [we]re seeking asylum," DHS Agmt. 1, ABCNY was operating a "shelter" within the plain and ordinary meaning of that term.  To accept its arguments to the contrary would be to read the term out of

hotel.  *See* DHS Agmt. §§ 4-5 (requiring, for example, "housekeeping services at least every other day").

Finally, ABCNY emphasizes the DHS Agreement's explicit acknowledgment that the Hotel was not licensed to be a shelter.  *See* Pl.'s Opp'n 6-7 (citing DHS Agmt. Ex. A, Art. II § 1).  But this emphasis is a red herring.  The applicability of the "Shelter Deductible" turned on whether the Hotel was or became "a shelter" — not a *licensed* shelter.  *See* FAC ¶ 35.  And, in any event, the DHS Agreement's acknowledgment is nothing more than a statement of fact: that the Hotel was not licensed as a shelter.  If anything, the natural take away from the provision as a whole is that DHS and ABCNY were agreeing that the Hotel could and would act as a shelter as part of the City's emergency efforts to house an influx of asylum seekers *even though* it was not formally licensed to do so.  Among other things, the provision went on emphasize that, if "necessary," the City would "obtain any and all permits, licenses and other approvals" in order to make the Sanctuary Hotel Program work and required the Hotel to "reasonably cooperate" if and when such licenses become necessary.  DHS Agmt. Ex. A, Art. II § 1.  That reading is reinforced by the fact, noted above, that elsewhere the DHS Agreement provided that asylum seekers housed at the Hotel would be "regulated pursuant to New York State Social Services Law and the *shelter regulations* in 18 NYCRR Parts 491 and 900."  *Id.* Attachment A (emphasis added).

In the final analysis, ABCNY agreed to language that would limit its ability to recover if it was operating a "shelter."  There may be edge cases where distinguishing between a "hotel" and a "shelter" would be difficult, but this is not one of them.  In agreeing to provide, and then providing, "temporary housing" for "homeless individuals and families who [we]re seeking asylum," DHS Agmt. 1, ABCNY was operating a "shelter" within the plain and ordinary meaning of that term.  To accept its arguments to the contrary would be to read the term out of

the policies at issue altogether, which the Court may not and will not do. *See, e.g.*, *Wilmington Sav. Fund Soc'y, FSB v. Cash Am. Int'l, Inc.*, No. 15-CV-5027 (JMF), 2016 WL 5092594, at *5 (S.D.N.Y. Sept. 19, 2016) ("[Plaintiff] seeks to rewrite the contract to say something other than what it says. Far from compelling that outcome, New York law expressly prohibits it. That is, this Court may not 'by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'" (quoting *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 892 N.Y.S.2d 303, 307 (2009))); *Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 348 (S.D.N.Y. 2013) ("A written contract must be interpreted according to the parties' intent, which is derived from the plain meaning of the language employed in the agreements." (internal quotation marks omitted)). It follows that the "Shelter Deductible" applies and that ABCNY's claims for breach must be dismissed.[5]

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED, and ABCNY's claims are dismissed. Further, the Court declines to *sua sponte* grant ABCNY leave to amend. To be sure, leave to amend a pleading should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). But it is "within the sound discretion of the district court to grant or deny leave to amend," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007), and there are several reasons to exercise that discretion to deny leave here. First, the problems with ABCNY's claims are substantive, so amendment would be futile. *See, e.g.*,

---

[5] In the Amended Complaint, ABCNY alleges that its damages from the fire are "believed to be in excess of two hundred fifty thousand dollars ($250,000.00)." FAC ¶ 55. But that allegation is conclusory and, in any event, ABCNY does not dispute in its memorandum of law that Defendants are entitled to dismissal if the "Shelter Deductible" applies.

*Roundtree v. NYC*, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (citing cases).  Second, ABCNY does not request leave to amend or suggest that it is in possession of facts that would cure the problems with the dismissed claims.  *See, e.g.*, *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014) ("A plaintiff need not be given leave to amend if [it] fails to specify how amendment would cure the pleading deficiencies in [its] complaint."); *accord TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505-06 (2d Cir. 2014).  Finally, the Court granted ABCNY leave to amend its original complaint in response to Defendants' first motion to dismiss, which raised the defects in the claims discussed above, and explicitly warned that ABCNY would "not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss." ECF No. 16.

    The Clerk of Court is directed to terminate ECF No. 18, to enter judgment in favor of Defendants consistent with this Opinion and Order, and to close the case.

    SO ORDERED.

Dated: June 25, 2024  
       New York, New York

                                              JESSE M. FURMAN  
                                              United States District Judge